Derrick WILLIAMS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–9606–CR–450.

Supreme Court of Indiana.

Dec. 11, 1997.

**164**

Lesa Lux Johnson, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Andrew L. Hedges, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

On this direct appeal from convictions for conspiracy to commit murder, murder, and attempted murder, Derrick Williams raises five issues. He contends that:

(1) courtroom security procedures violated his Indiana and United States constitutional right to a public trial;

(2) the evidence was insufficient to support the convictions;

(3) the trial court failed to articulate reasons for enhancing the sentence or for imposing consecutive sentences, and that the consecutive sentences were manifestly unreasonable;

(4) it was reversible error to admit certain evidence that should have been excluded under Indiana Evidence Rule 404(b); and

(5) it was error to deny his motion for a change of venue.[1]

---

1. Williams also contends that the court improperly instructed the jury on the elements of attempted murder. Because we overturn the conviction for attempted murder on other grounds, we do not address this claim.

We affirm the convictions for conspiracy to commit murder and for murder. Because Indiana law prohibits conviction of both conspiracy and attempt to murder the same person, we reverse the conviction for attempted murder and remand for new sentencing.

## Factual Background

In October 1993 five men fired at least sixty-five rounds of ammunition from assault rifles at the door and walls of an apartment in a complex in Indianapolis. A sixteen year old girl passing by the apartment was killed by a bullet to the head and inside a seven year old boy was permanently injured. The five shooters—Andre Gaston, Odell Marbley, Joseph Morrow, Darren Ridley, and Derrick Williams—were members of the "Ghetto Boys," a group organized to sell crack cocaine.[2] According to trial testimony by Gaston and two other Ghetto Boy members, Melvin Cornelious and Eugene Childs, the shooting was intended as retaliation against Stacey Reed. The day before the shooting Reed had broken into a Ghetto Boy member's house and stolen from the group's stash of cocaine. This was Reed's second such theft in a matter of days. Gaston testified that he received a call the next day from Williams to invite him to a meeting of the group at Ridley's mother's house. When Gaston arrived—with Ridley, Marbley, and Morrow already present—Williams told him of their intent to "get" Reed later that day. Williams asked Gaston to get his gun, and Gaston and Morrow temporarily left the group.

Earlier that day, Morrow had purchased three MAK–90 assault rifles (AK–47 clones), ten 30–round ammunition clips, and 500 rounds of ammunition. The group reassembled, this time at Ridley's father's house. The five were met there by Cornelious and Childs, who testified that when they arrived at the house, there was an assortment of assault rifles, other guns, and ammunition on the porch. Both testified that Ridley expressed the group's intention to kill Reed. In the meantime, they were joined by two others, Eddie Dean Gregory and "Old Man" Prewitt,[3] who arrived in a pickup truck and were informed of the plan. Williams asked Gregory to pick up some more ammunition as well as a battery for a sight—a rifle attachment emitting a narrow beam of light to zero in on a target. Gregory and Prewitt left on this errand and soon returned with the goods. The group then sat on the porch with the loaded weapons and waited.

At dark the group, now numbering nine, drove in three vehicles—two rental cars and the pickup truck—to the apartment complex where they believed they would find Reed. The two rental cars and their occupants remained at the perimeter of the complex while the pickup—with Prewitt driving and Gregory in the cab—drove inside. Gregory got out, went to the apartment where Reed was staying, and spoke with him. Gregory and Prewitt then rejoined the others and Gregory reported that Reed was in the apartment as expected. At this point, the two cars drove to another nearby location and met the pickup. The five shooters, with their loaded weapons, boarded the back of the pickup, and rode to the apartment. Cornelious and Childs—the drivers of the two cars—stayed behind. Gregory and Prewitt remained in the cab of the truck as the five shooters jumped out, stood shoulder-to-shoulder and opened fire on the apartment from a distance of about sixty yards. The shooting lasted between sixty and ninety seconds. They then reboarded the pickup, drove back to where they left the two cars, and fled the scene.

The trial took place in early 1996. The evidence included the testimony of Cornelious Childs, and Gaston, all of whom had reached plea agreements with the State. An eyewitness also identified Ridley as one of the shooters. In addition, the State introduced testimony and documentation from gun dealers to prove Morrow's weapons pur-

**2.** Four of the five shooters were named defendants at trial. Gaston pleaded guilty to the conspiracy charge in exchange for his testimony and a thirty year sentence. The charges on the other two counts were dropped. A sixth man, Eddie

Dean Gregory, was charged on all counts and was the fifth defendant at trial.

**3.** Prewitt died sometime after the shootings and was not involved in these proceedings.

chases on the day of the crime and to prove the purchase by a gang member in 1991 of a Terry Carbine, known to have been used in the shooting. The purchaser testified that he gave the Terry Carbine to Williams. The State offered this evidence, as well as guns seized from Marbley, Morrow's sister, and another Ghetto Boy member, to show that the defendants possessed weapons of the type used in the shooting, even if the precise weapons could not be identified. Further, a ballistics expert testified that the barrel of a Terry Carbine[4] among the items seized from Morrow's sister fired at least one of the many bullets in the shooting.

Williams and his co-defendants were each charged and convicted of conspiracy to commit murder, murder, and attempted murder. The trial court sentenced each of them to consecutive sentences of fifty, sixty, and fifty years respectively. Williams is the sole appellant in this case.[5] We affirm Williams' convictions for conspiracy to commit murder and for murder, but, as explained below, reverse the conviction for attempted murder.

## I. Right to a Public Trial

During the trial members of the public who sought access to the courtroom were required to pass through a metal detector and "wand." In addition, spectators who were unknown to the court were required to present identification to the officer at the door and sign in. Williams contends that taken together, these security measures were "tantamount to closing the doors" of the courtroom and therefore violated his right to a public trial as guaranteed by § 13 of the Indiana Constitution and by the Sixth Amendment of the United States Constitution. All defendants raised objections to the use of the identification procedures as a violation of their constitutional right to a public trial. On appeal, Williams challenges the cumulative effect of all of the security precautions. The objection at trial, however, was only to the identification procedures.

None of the defendants specifically objected to the use of a metal detector or wand. Indeed, the basis of objection for Williams' counsel was that with the metal detector and wand in place, security was sufficient and nothing else was needed. Because there was no objection at trial to the metal detector and wand, to the extent they present any issue, it is waived.[6]

Williams also asserts, without citing authority or developing his argument, that the security measures were a "display" designed to convey to the jury that the defendants were dangerous and so deprived them of a fair trial by impartial jury. As discussed in note 8, *infra*, Williams makes no showing of prejudice. Nor does he develop any cogent argument as to why the conclusion he urges is a logical inference for the jury to draw. In sum, the claim on appeal breaks down to whether the identification procedures violated Williams' right to a public trial.

## A. The Source of the Right

The Sixth Amendment of the U.S. Constitution provides that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." U.S. CONST. amend. VI. The right to a jury trial was incorporated into the Fourteenth Amendment guarantee of due process in *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) and the right to a speedy trial was incorporated by *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). No case similarly explicitly incorporates the public trial right. Nonetheless, in *Duncan*, the Court listed the public trial right as a right that had already been incorporated, citing *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948). *Oliver* held that a public trial was a component of Fourteenth Amendment Due Process as such but did not explicitly decide or turn on a Sixth Amendment claim. Similarly, in *Waller v.*

---

4. The Terry Carbine itself was never recovered.

5. Ridley's, Morrow's and Marbley's appeals are also decided today in *Ridley v. State*, 690 N.E.2d 177 (Ind.1997), *Morrow v. State*, 690 N.E.2d 183 (Ind.1997) and *Marbley v. State*, 690 N.E.2d 185 (Ind.1997).

6. We note that as a general matter, metal detectors, wands, and the like are common useful security measures that do not impede access or exclude the public from the courtroom. Such measures properly exclude weapons not people.

*Georgia,* 467 U.S. 39, 39, 47, 104 S.Ct. 2210, 2212, 2216, 81 L.Ed.2d 31 (1984) the Court referred to the "Sixth and Fourteenth Amendment right to a public trial" and held that the Sixth Amendment public trial right applied to a state's motion to suppress hearing. We conclude that *Waller* established that the public trial right of the Sixth Amendment applies to the states via the Fourteenth Amendment. To the extent that this Court in *Marshall v. State,* 254 Ind. 156, 158, 258 N.E.2d 628, 629 (1970) indicated that state courts are not bound by federal Sixth Amendment jurisprudence on the public trial right, *Marshall* is no longer valid.

In addition to the Sixth Amendment, Section 13 of the Indiana Constitution provides that "In all prosecutions, the accused shall have the right to a public trial...." IND. CONST. art. I, § 13. In advancing his argument, Williams makes no contention based on the language or history of the State Constitution. To the extent he cites Indiana authority, he relies on no cases that effectively treat the public trial guarantee in § 13 as distinct from its federal counterpart. Rather, the Indiana cases he cites discuss both rights together as yielding the same result. *See, e.g., Hackett v. State,* 266 Ind. 103, 360 N.E.2d 1000 (1977); *Kendrick v. State,* 661 N.E.2d 1242 (Ind.Ct.App.1996). Accordingly, we resolve Williams' U.S. and Indiana constitutional claims on the basis of federal constitutional doctrine and express no opinion as to what, if any, differences there may be under Article I, § 13 of the Indiana Constitution. *Cf. Games v. State,* 684 N.E.2d 466 (Ind. 1997).

The right to a public trial has long been recognized as a fundamental right of the accused. *Oliver,* 333 U.S. at 266–67, 68 S.Ct. at 504; *Hackett,* 266 Ind. at 109, 360 N.E.2d at 1004. It helps ensure a fair trial because "the presence of interested spectators may keep [the accused's] triers keenly alive to a sense of their responsibility and to the importance of their functions...." *Waller,* 467 U.S. at 46, 104 S.Ct. at 2215 (quoting *Gannett Co. v. DePasquale,* 443 U.S. 368, 380, 99 S.Ct. 2898, 2906, 61 L.Ed.2d 608

(1979) (in turn quoting *Oliver,* 333 U.S. at 270 n. 25, 68 S.Ct. at 506 n. 25)). It protects the accused by allowing the public to assess the fairness of the proceedings. In addition, it encourages witnesses to come forward, and discourages perjury. *Waller,* 467 U.S. at 46, 104 S.Ct. at 2215. In addition to the rights of the defendant, the public trial implicates the First Amendment right of the press and public to attend a criminal trial, *Globe Newspaper Co. v. Superior Court for Norfolk County,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), or other proceeding. *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (extending First Amendment right of access to voir dire). However, neither right is absolute. Complete or partial exclusion of the public may be justified if a court finds "that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Waller,* 467 U.S. at 45, 104 S.Ct. at 2215 (quoting *Press–Enterprise,* 464 U.S. at 510, 104 S.Ct. at 824). *See also Hackett,* 266 Ind. at 110, 360 N.E.2d at 1004 (exclusions may be justified by a legitimate purpose that furthers the integrity of the judicial process, so long as there is a sufficient record supporting the court's exercise of discretion). Examples of valid exclusions include forbidding the televising of a public trial, *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and protecting a witness fearful of retaliation by those attending the trial, *Hackett,* 266 Ind. at 110, 360 N.E.2d at 1004; *Kendrick,* 661 N.E.2d at 1242.

In addition to his constitutional right, Williams relies on Indiana's statutory protection of public access to criminal proceedings. The Indiana Code provides that "Criminal proceedings are presumptively open to attendance by the general public." IND.CODE § 5–14–2–2 (1993), and defines "open to attendance" as meaning "that individuals have the right freely to attend and observe criminal proceedings."[7] *Id.* at § 5–14–2–1. The

---

**7.** The identification procedures did, to a certain extent, render the trial marginally less "open."

Someone who, for whatever reason, had no identification on a given day would have been barred.

general public may be excluded from a criminal proceeding, however, if the court "first affords the parties and the general public a meaningful opportunity to be heard on the issue of any proposed exclusion." *Id.* at § 5–14–2–3. In addition, as Williams notes, the Code further provides:

> This chapter does not affect the inherent power of a court to make limited exclusions of witnesses, to relieve overcrowding, to protect the order and decorum of the courtroom, or to exclude those individuals whose presence constitutes a direct threat to the safety of the spectators, parties, or witnesses.

*Id.* at § 5–14–2–7.

### B. *Exclusion of the Public is an Element of Violation of the Right to a Public Trial*

■ Whether phrased in constitutional or statutory terms, however, Williams' claim suffers from a basic flaw. Both a common sense reading of "exclusion," and, more importantly, the cases interpreting the public trial right, conceive of an exclusion as an affirmative act specifically barring some or all members of the public from attending a proceeding. *Waller,* 467 U.S. at 39, 104 S.Ct. at 2212 (closure of suppression hearing); *United States v. Al–Smadi,* 15 F.3d 153, 154 (10th Cir.1994) (denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom); *Hackett,* 266 Ind. at 109, 360 N.E.2d at 1003 (closure of proceedings to public for testimony of one witness). This simple observation renders the above outline of the law of public access to criminal proceedings largely superfluous because, quite simply, the trial court did not exclude a soul. The security procedures required that each person who was unknown to the officer at the door show identification and sign in. Neither requirement actively excludes anyone. The identification requirement introduced a minor procedural hurdle to gaining admittance to the trial by demanding the production of some form of identification, which is an item readily available to the general public.

Williams does not argue that this requirement made it physically impossible for anyone to attend. Specifically, Williams does not contend that there were people who could not produce the required identification because they had no way to identify themselves. Rather, he argues that the public trial right was implicated because of what can be deemed a constructive exclusion of the public. Although he does not state exactly how the procedures constructively worked an exclusion, presumably his argument is that because many of his supporters were "Ghetto Boy" members and, as conceded by Marbley's counsel, may have had prior encounters with law enforcement they were not eager to leave their names at the door for possible scrutiny by law enforcement officials. At the extreme, perhaps some were wanted fugitives. At a minimum they may have been persons who feared the consequences that a potential background check would entail. The security precautions, so the argument goes, constructively established a bar to Williams' supporters and thereby deprived Williams of his right to a public trial. Indeed, at trial co-defendant Gregory used the word "intimidation" to describe the effect the procedures had on the relevant members of the public. But the defendant's right does not protect against constructive exclusion. It requires some showing that the court, by order or otherwise, physically prevented the public from attending. *Al–Smadi,* 15 F.3d at 154. Even if it is true that some of Williams' supporters decided not to attend the trial because of the security procedures, Williams' right to a public trial is not implicated because there is no evidence, or even an allegation, as to how this affected the fairness of the proceedings or any of the objectives of the Sixth Amendment. There is no showing or allegation that the people who did attend affected the result in any way.[8] In sum, this

Although this does not affect Williams' right to a public trial, as we note *infra,* it is an important concern because of its First Amendment implications.

8. Similarly, it does not follow that the procedures violated the due process right to a fair trial—to which Williams alludes but does not develop. The Sixth Amendment right to be tried by an impartial jury, applicable to the states by

simply is not a case of partial or total closure of the proceedings to the public and so the constitutional right to a public trial is not implicated by the procedures as they were used in this case.[9]

## C. Restrictions on Courtroom Access and the Rights of the Public

 Although Williams does not establish reversible error, it does not follow that the procedures were justified or properly taken. When a court authorizes procedures of this type it affects the openness of the proceedings in general with a potential impact not only on the defendant's rights, but also on the First Amendment rights of the press and the public to attend the trial.[10] *Globe Newspaper,* 457 U.S. at 596, 102 S.Ct. at 2613. A slight burden, such as identification, may hinder a person's ability or willingness to attend open proceedings on a given

day. Perhaps more significantly, the free flow of ideas and information may be facilitated by anonymous monitoring of public proceedings, including courts. Even where the measure does not amount to a violation of the constitutional rights of the defendant, when access to public proceedings is impeded, even slightly, the right to be free to walk into court and assess our justice system in operation comes under threat. Any such restriction must be imposed only with proper justification. Accordingly, we require under our supervisory powers that the court make a finding that specifically supports any measures taken beyond what is customarily permitted that are likely to affect unfettered access by the press and public to the courtroom. The finding need not be extensive, but must provide the reasons for the action taken, and show that both the burdens and benefits of the action have been considered.[11]

the Fourteenth Amendment, *Duncan,* 391 U.S. at 145, 88 S.Ct. at 1444, protects a defendant against "the intrusion of factors into the trial process that tend to subvert its purpose," such as a "hostile" atmosphere. *Estes v. Texas,* 381 U.S. 532, 552, 85 S.Ct. 1628, 1637, 14 L.Ed.2d 543 (1965). Accordingly, a courtroom full of armed uniformed police officers could prejudice a defendant's chance of receiving a fair trial. *Holbrook v. Flynn,* 475 U.S. 560, 570, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986) (holding that some courtroom security did not violate the right to a fair trial); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). In order to prevail on such a claim, a defendant must show that the measures taken created either an actual or inherent prejudicial effect on the jury. *Holbrook,* 475 U.S. at 572, 106 S.Ct. at 1347–48; *see also Woods v. Dugger,* 923 F.2d 1454, 1457 (11th Cir.1991). Inherent prejudice occurs when "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook,* 475 U.S. at 570, 106 S.Ct. at 1346–47 (quoting *Estelle v. Williams,* 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976)). Because the procedures in this case regulated access to the courtroom and did not affect the actual conduct of the trial, they were presumably not known to the jury. If so, there was no actual prejudice. As the record shows, the metal detector was outside the courtroom and so outside the presence of the jury. In addition, the defense attorneys were initially unaware of the signing in procedure, which hardly supports Williams' claim that the procedures were a "display" and therefore prejudicial. Even if they were known, from this record it appears that they were inconspicuous and incidental to the jury's impression of the conduct and content of the trial itself. For all these reasons, the procedures were not actually or

inherently prejudicial, and Williams points to no prejudicial effect.

9. In *United States v. Brazel,* 102 F.3d 1120 (11th Cir.1997) the court was faced with a procedure similar to the identification procedure at use in the current case. In *Brazel,* the district court ordered that all persons entering the courtroom identify themselves by identification card, name, address, and birth date. The court upheld the procedure as one initiated by the judge as a response to her concerns about intimidation of witnesses from those in attendance. Although the court analyzed the claim under the Sixth Amendment's guarantee of a public trial, it did so only after it *assumed* that there had been a partial closure. *Id.* at 1155. Because we held that there was not an exclusion, the public trial right is not implicated and the analysis stops.

10. No defendant objected to the security measures on the ground that they excluded the press from attending the trial and there is no contention on appeal that the press was excluded by the measures taken.

11. Of course, the trial court has considerable discretion in matters of maintaining order and security for the courtroom, *Smith v. State,* 475 N.E.2d 27 (Ind.1985); *Howard v. State,* 467 N.E.2d 1 (Ind.1984), and to manage and control the proceedings conducted before it. *Williams v. State,* 669 N.E.2d 1372 (Ind.1996), *reh'g denied, cert. denied,* —— U.S. ——, 117 S.Ct. 1828, 137 L.Ed.2d 1034 (1997). The requirement we announce today is not designed to interfere with a court's exercise of discretion. Rather, it is in line with the requirement already in place re-

This exercise of supervisory powers applies to trials conducted after the publication of this opinion.

The trial court in this case failed to provide such a record. The record shows that when defense attorneys learned of the scheme they objected and a colloquy ensued. It turned out that the procedures were implemented at the initiative of the prosecutor who made the request to law enforcement officials. They were then ratified by the court after the defense objected. The prosecutor said he requested the metal detector, wand, and presentation of identification because the same procedures were used in the federal trial of the same defendants on drug trafficking charges.[12] Further, he said the record keeping was his idea, prompted by his experience in a different trial where some of the witnesses and attorneys were threatened by spectators. Two of the defense attorneys protested that threats or other similar conduct had not occurred in this case and that there was no reason to suspect that threatening conduct would occur. The court then authorized all the procedures and specifically permitted the checking of records, so long as both sides had access to any information discovered. The court made no findings as to why the procedures were warranted.

██ Because the court did not provide the reasons for its decision to authorize the procedures, and because the record does not clearly substantiate the need for these additional precautions, the trial court's condoning

of use of the identification procedures does not meet the standard we announce today. As an abstract proposition, this kind of procedure seems likely to produce both a slight burden and a slight benefit. The taking of names is perhaps intimidating for some, but the practice also is likely to help control courtroom behavior. Because it alerts spectators that the court can identify them, it may discourage some who might otherwise have disrupted the proceeding in the hope of remaining anonymous. Accordingly, when considering this sort of procedure, a court must weigh the prospective benefits to the order and security of the courtroom with the burdens to the defendant, the press, and the public.

## II. Sufficiency of the Evidence

██ Williams contends that there was insufficient evidence to convict him of conspiracy to commit murder, attempted murder, or murder. A conviction for conspiracy requires the State to prove that the defendant had the intent to commit a felony, agreed with another person to commit that felony, and that an overt act in furtherance of the agreement was performed by a party to the agreement. IND.CODE § 35–41–5–2 (1993).[13] Gaston's testimony that Williams told him of the group's plan to kill Reed, requested him to get his weapon, and participated in the joint actions described in the facts part of this opinion—the loading of weapons, the drive to the apartment com-

---

garding similar types of orders that affect a fair trial. For example, when a court authorizes security measures that are visible to the jury, beyond those customarily employed, the court must make a record of the reasons for the decision. *Williams v. State*, 264 Ind. 664, 348 N.E.2d 623 (1976) (holding that defendant was not prejudiced and so was not denied a fair trial by the trial court's decision—supported by the record—to permit armed, uniformed deputies to stand in the courtroom). *See also Timmons v. State*, 500 N.E.2d 1212, 1216 (Ind.1986); *Parker v. State*, 567 N.E.2d 105, 111 (Ind.Ct.App.1991) (extra security measures inside the courtroom were warranted where a sizeable group of witnesses and defendants were convicted felons). Although the measures in the current case do not as obviously implicate a fundamental right as did those in *Williams*, 348 N.E.2d at 633, the measures here do have an impact on First Amendment rights. A court may not impose restraints

that curtail public access to court proceedings without making a record detailing the reasons for its decision.

**12.** Marbley was not a defendant in the federal case.

**13.** Williams cites *United States v. Morris*, 957 F.2d 1391 (7th Cir.1992) for "Wharton's Rule," an exception to the general rule that a conspiracy and the completed substantive offense, in this case murder, are separate crimes and may be punished by separate sentences. *Id.* at 1403. Wharton's rule, however, only applies when concerted activity and a plurality of criminal agents are required elements of the substantive offenses. Although the conspiracy and murder in this case involved concerted activity by a plurality of criminal agents these were not elements of the crimes of conspiracy or murder. Accordingly, Wharton's rule does not apply.

plex—is obviously more than enough to show intent, agreement, and an overt act. *Vance v. State,* 640 N.E.2d 51, 57 (Ind.1994).

Based on the same evidence we also affirm the conviction of murder. Williams contends that the evidence underlying the murder conviction was insufficient because there was no evidence that he intended to kill the victim. Williams overlooks, however, the doctrine of transferred intent. If a person deliberately attempts to kill one person but in the process kills another, the intent to kill is transferred and he may be found guilty of murder of the person who was killed. *White v. State,* 638 N.E.2d 785, 786 (Ind.1994). Williams and his confederates had a stated intent to kill Reed in retaliation for a drug theft. They fired multiple rounds into an apartment complex with automatic weapons in an execution-style killing. We have little difficulty concluding that Williams was aware of a high probability under these circumstances that he was engaging in murder of someone, which is all that had to be shown. The conviction for murder is affirmed.[14]

Finally, Williams contends that the evidence did not support the conviction of attempted murder. We do not reach the merits of his contention because we overturn this conviction on other grounds. Although not cited by the parties, Indiana Code § 35–41–5–3(a) provides that: "A person may not be convicted of both a conspiracy and an attempt with respect to the same underlying crime." Counts I and III of the Information charged Williams and the other defendants—Gregory, Marbley, Morrow, and Ridley—with both the conspiracy to murder Reed and the attempted murder of Reed. Although it is proper for the State to charge and prosecute for both an attempt and a conspiracy with respect to the same underlying crime, *State v. Hancock,* 530 N.E.2d 106, 108 (Ind. Ct.App.1988), the statute prohibits convictions on both charges.[15] IND.CODE § 35–41–5–3(a) (1993); *Haymaker v. State,* 528 N.E.2d 83, 87 (Ind.1988) (conviction and sentence for attempted robbery vacated pursuant to Indiana Code § 35–41–5–3(a) where defendant was convicted and sentenced to both the attempt to commit robbery and the conspiracy to commit the same robbery). In this case, Williams was convicted and then sentenced for both a conspiracy and an attempt of the same underlying crime, the unsuccessful effort to murder Reed. At sentencing, the trial court should have merged the two charges. *Lawrence v. State,* 665 N.E.2d 589, 590 n. 1 (Ind.Ct.App.1996) (trial court merged convictions of attempted murder and conspiracy to commit murder). To convict and sentence on both charges was fundamental error because it was a conviction prohibited by the statutes under effect when the defendant was charged. Accordingly, we remand with instructions to vacate the conviction and sentence for attempted murder.

## III. Sentencing

The trial court ordered consecutive maximum sentences for all three charges: fifty years each for conspiracy to commit murder and attempted murder, and sixty years for murder. Williams contends that in the sentencing statement, the court failed to articulate sufficient reasons to justify both the enhancements and the consecutive sentences, and that the court failed adequately to distinguish between these two decisions. He also contends that it was manifestly unreasonable to order consecutive sentences. Because we vacated the conviction for attempted murder,

---

**14.** Relatedly, Williams contends that the jury instruction on murder was deficient because it did not inform the jury that to prove murder, the State must prove that Williams intended to kill the specific victim. Although Williams has waived this claim for failing to object to the instruction, the claim also readily fails on the merits. Had the jury been instructed as Williams suggests, the court would have incorrectly stated the law. The intent element of murder requires only that a person intend to kill someone. This intent can then, if necessary, be transferred to the actual victim. The jury was properly instructed that the intent element for murder was satisfied if Williams had the intent to kill someone.

**15.** We do not decide whether the statute would have been implicated if the Information had charged the defendants with the attempted murder of the boy wounded in the shooting, instead of with the attempted murder of Reed.

we consider Williams' claims only as to the conspiracy and murder charges.

It is within the trial court's discretion to determine the appropriate sentence, including whether a sentence will be increased or decreased and whether multiple sentences are to be concurrent or consecutive. *Ector v. State*, 639 N.E.2d 1014, 1015 (Ind.1994). The trial court will be reversed only upon a showing of a manifest abuse of discretion. *Id.* In the sentencing statement, the court must: (a) identify all significant mitigating and aggravating circumstances found; (b) specify the facts and reasons which lead the court to find the existence of each such circumstance; and (c) demonstrate that the mitigating and aggravating circumstances have been evaluated and balanced in determining the sentence. *Crawley v. State*, 677 N.E.2d 520, 521 (Ind.1997).

The court enumerated several aggravating factors. Pursuant to Indiana Code § 35–38–1–7.1(a) the court found that: there was an "absolute and utter" risk that Williams would commit another crime, the nature and circumstances of the crimes—an ambush that killed one innocent bystander and permanently wounded another—spoke for themselves, and Williams' several prior arrests—including for battery, assault, and drug trafficking—and scant employment history all spoke ill of his character and condition. The court also noted the suffering the crimes caused the two families of the victims and that Williams had served six months probation but without rehabilitative effect.

Williams contends that the court did not sufficiently articulate its reasons for enhancing the sentences or imposing consecutive sentences. However, the court clearly explored, with an unfavorable result, the character and condition of the defendant. A single aggravating circumstance is enough to justify an enhancement or the imposition of consecutive sentences. *Isaacs v. State*, 673 N.E.2d 757, 765 (Ind.1996). The court did not elaborate at length or with particularity, for example, the reason Williams was a risk to commit another crime. Nor did the court explain exactly why an ambush was noteworthy. However, the nature of the crime and the record in the case fully support the

court's conclusions as to the presence and weighing of aggravating factors. Williams and others of a group organized to distribute illegal drugs undertook to kill Reed for interfering with the group's drug trade. They sent a fusillade into an occupied home, killing one child and wounding another. Williams' criminal history was established and provides a reasoned basis for concluding that Williams was at risk to commit another crime. In sum, the statement of the court's reasons was adequate because the record clearly discloses the factual basis for the court's determination. *Henderson v. State*, 489 N.E.2d 68, 72 (Ind.1986).

Williams contends that the court did not adequately separate the decision to enhance the sentence from the decision to impose consecutive sentences and cites *Hunt v. State*, 550 N.E.2d 838, 845 (Ind.Ct.App.1990) (the sentence enhancement and imposition of consecutive sentences are separate and discrete decisions for the court and the reasons for each must be stated). From the sentencing statement, it is clear that the court did not differentiate these two decisions. Instead, after reciting the aggravating factors, the court imposed an enhanced consecutive sentence. However, as the court also said in *Hunt*, the same reasons may be used to justify both an aggravated sentence and a consecutive sentence. *Id.* *See also Isaacs*, 673 N.E.2d at 765. Further, *Hunt* cited *Henderson* for the proposition that when the record clearly discloses the factual basis for the court's determination, and shows that the court engaged in evaluative processes, then the sentence will stand. *Hunt*, 550 N.E.2d at 845; *Henderson*, 489 N.E.2d at 72. Accordingly, we hold that the record supports the finding of at least three aggravating factors that are enough to support the consecutive, enhanced sentences for murder and conspiracy to commit murder. Finally, considering the nature of the offenses and character of the defendant, the sentence is not manifestly unreasonable. Ind.Appellate Rule 17(B).

## IV. Evidentiary Issues

Williams contends that the trial court erred in admitting a variety of evidence all of

which he classifies under the rubric of "prior bad acts" under Indiana Evidence Rule 404(b).[16] There are a total of fifteen separate claims which break down into five issues. Williams objects to the prejudicial effect of evidence regarding: (1) Williams' membership in the Ghetto Boys and the group's drug related activities; (2) his prior federal conviction for drug related offenses; (3) an assortment of weapons; (4) telephone records documenting certain cellular telephone calls; and (5) speculative opinion testimony by two law enforcement officials.

■ As detailed below, some of his claims were not objected to at trial and are waived. *Mullins v. State*, 646 N.E.2d 40, 44 (Ind. 1995) (in order to preserve a claim of trial court error in the admission or exclusion of evidence, it is necessary at trial to state the objection together with the specific ground or grounds therefor at the time the evidence is first offered). Moreover, to the extent the remainder raise 404(b) claims, they are subject to waiver because Williams did not object on 404(b) grounds to any of these claims at trial. *Marshall v. State*, 621 N.E.2d 308, 316 (Ind.1993); *Ingram v. State*, 547 N.E.2d 823, 830 (Ind.1989) (any grounds not raised in the trial court are not available on appeal). In any event, we consider the merits of some of the remaining claims according to the terms of the objections made at trial, at least where there is some similarity between the argument on appeal and the objection made at trial. We hold that in most cases, the trial court correctly admitted the evidence. Where there was error, however, the error was harmless and did not prejudice Williams' substantive legal rights.

### A. *Gang Membership and Drug Related Activities*

Williams contends that the admission of the Ghetto Boy "creed" and Ghetto Boy "commandments" was evidence of a prior wrong or bad act inadmissible under Indiana Evidence Rule 404(b). The commandments list sixteen rules for an organization referred to as the "Getto Gangster Nation." They embrace the theme of loyalty to the group and its leaders, called "Kings," and list as one commandment, that criticism of the group will not be tolerated. The "Getto Creed," which is signed by the words "Brotherhood of the Struggle," is something akin to a statement of purpose, which again states loyalty to the group and its Kings. Both documents were seized pursuant to a warrant authorizing a search of Ridley's house, where Marbley had a bedroom. The commandments were found in Marbley's room and the creed was found either there, or in Ridley's mother's bedroom. At trial, all defendants objected to this evidence on two grounds: failure to authenticate and relevancy. Accordingly, the 404(b) claim is waived because it was not preserved at trial. *Marshall*, 621 N.E.2d at 316. Alternatively, Williams contends that even if admissible under 404(b), the creed and commandments should have been excluded because their prejudicial impact far outweighed their relevance.

■ The State argues that these documents were evidence of membership in the Ghetto Boys and that this was a relevant issue in the case. We agree. The State contended that members of the Ghetto Boys planned to kill Reed because he stole from the gang. Membership in or involvement with the gang was therefore highly probative of the motive for the shooting in the case. As a general rule, evidence of motive is relevant in the proof of a crime. *Tompkins v. State*, 669 N.E.2d 394, 397 (Ind.1996). Testimony by gang members had established that the reason for the shooting was drug related and that the defendants were gang members. The creed and commandments, to the extent they show membership in an organization, corroborate this testimony. In sum, the evidence gives rise to an inference of motive and the balance of its probative value against prejudicial effect was within the court's discretion.

---

**16.** Indiana Evidence Rule 404(b) provides in part:

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

In addition, Williams contends that these two documents were not properly authenticated. Although the argument is not developed on appeal and was not addressed by the State, the authentication argument made at trial focused on the fact that no effort was made to prove ownership of the documents. The officer who found the documents testified only to where and when she discovered them and to what they appeared to be on their face. This is not necessarily sufficient to establish by a witness with personal knowledge, in the language of Indiana Evidence Rule 901(a), "that the matter in question [was] what [the] proponent claim[ed]." However, any of the defendants was free to offer an alternative explanation for the documents different from what they on their face appear to be. In the absence of genuine dispute as to authenticity, their admittance is not reversible error. Finally, Williams contends that it was error under Rule 404(b) to admit portions of Cornelious' testimony. Cornelious testified that Williams was a member of the Ghetto Boys, which he described as a "gang that sells drugs," specifically crack cocaine. However, Williams did not object to this testimony at trial and the issue is waived. *Mullins*, 646 N.E.2d at 44.[17]

### B. *Gun Related Evidence*

Next, Williams raises a number of evidence issues related to weapons. At trial the court admitted as State's evidence for demonstrative purposes, a MAK–90 assault rifle (an AK–47 clone), a Terry Carbine assault rifle, and an ammunition clip.[18] All defendants except Marbley objected to their use for demonstrative purposes. Also introduced was documentation of and testimony by James Smith, a Fishers, Indiana gun dealer, about Morrow's purchase of three MAK–90s, ammunition, and clips on the day of the shooting. Similar evidence was introduced of Morrow's purchase of a MAK–90 from the same dealer four months before the shooting. All defendants objected to the evidence of

both purchases on relevance grounds. The manufacturer of the Terry Carbine gun testified to the limited number of these weapons that were ever produced. Williams and others also objected to this testimony on relevance grounds. The owner of Don's Guns, another gun dealership, testified to the 1991 purchase of an AK–47 and a Terry Carbine by Donald Woods, a gang member not involved in the shooting. This evidence was admitted subject to a showing of further relevance. The State then introduced testimony by a police officer that this AK–47 was seized from Marbley, pursuant to a traffic stop, about two months after the shooting. The AK–47 was admitted without objection. In addition, Woods testified that he gave the Terry Carbine he purchased in 1991 to Williams that same year. Next, one Jeffrey Greene testified without objection that an AK–47 seized from him in a traffic stop a month after the incident had been given to him by Ridley's father a couple of days after the shooting with the request that he keep it for a little while. Photographs of the AK–47 and the clip that were seized from Greene were also admitted into evidence over objections by all defendants as irrelevant. Finally, an FBI agent testified without objection to the seizure of a Terry Carbine barrel and MAK–90 from Morrow's sister's residence about a year after the shooting. A ballistics expert testified that the Terry Carbine barrel seized from Morrow's sister had produced at least one of the bullets recovered from the crime scene. The MAK–90 was one of those Morrow purchased the day of the shooting.

■ On appeal, Williams argues that all of this weapons related evidence was inadmissible under Rule 404(b). It is by no means clear that weapons possession, evidence of gun sales, and the like, are necessarily prior "bad acts" for 404(b) purposes. In any event, the 404(b) question is waived because not preserved by objection at trial.

---

**17.** Co-defendant Marbley objected on personal knowledge and relevancy grounds. As previously discussed, the evidence about gang membership is relevant to the motive for the crime. Similarly, the evidence about the gang's involvement in drugs is also relevant to motive because it supports the State's contention that the group

planned to kill Reed because he stole drugs from the gang.

**18.** The MAK–90 later became substantive evidence after it was identified as one that was sold to Morrow on the day of the crime.

*Marshall,* 621 N.E.2d at 316. Similarly, those issues not objected to are also waived. *Mullins,* 646 N.E.2d at 44. At trial, however, Williams did preserve relevance objections to the gun related evidence. And on appeal Williams cites Rule 403 as an alternative to the 404(b) argument.[19] He claims that because the State did not connect the weapons introduced and referred to at trial to any of the weapons actually used in the shooting, they were irrelevant and highly prejudicial. The State responds, we think correctly, that the evidence was of high probative value and so was properly admitted. Evidence of Morrow's purchase of three MAK-90s only hours before the shooting gives rise to the inference that one or more of these weapons was used in the shooting. At a minimum it proves access to weapons of the type used in the shooting. For the same reason, the AK-47s seized from Marbley and from Woods, the MAK-90 and Terry Carbine barrel seized from Morrow's sister, and Morrow's purchases of MAK-90s were all admissible. In addition, this evidence corroborates Childs' and Cornelious' testimony that they saw AK-47 type weapons on the porch of the house when they joined the group. Further, the State proved that the barrel of this Terry Carbine fired a bullet at the crime scene. Accordingly, the evidence about the rarity of the weapon, the purchase of a Terry Carbine by Woods, and Woods' testimony that he gave it to Williams links a weapon proved to be used in the shooting to the group.

### C. *Prior Conviction*

At trial, FBI agent Franklin Fabian testified about his investigation of what he called the "Ridley organization" or "Ghetto Boys." He responded affirmatively when asked whether this investigation resulted in a conviction of Williams on federal drug trafficking charges. Williams objected that this evidence was irrelevant and hearsay.

On appeal, he objects on 404(b) grounds. Although we agree that it would have been error to admit the testimony under 404(b), Williams has waived this issue for failure to object on this basis at trial.[20] *Id.* Moreover, the admission of the testimony was harmless in light of the other evidence of Williams' involvement with the Ghetto Boys and the conspiracy to kill Reed.

### D. *Testimony about Monitored Cellular Telephone Calls*

■■■ Fabian testified that with the cooperation and consent of one Anthony Watkins he monitored cellular telephone conversations between Watkins and Williams during the time of the shooting. The State offered into evidence the telephone, the billing records of the phone, and subscriber information for the telephone number. Williams argues that Fabian testified to the contents of the telephone calls and that this testimony was inadmissible hearsay. However, Fabian did not testify to the content of the telephone conversations, only to the fact that calls were made and monitored.

### E. *Speculative Opinion Testimony*

During his testimony, Fabian was asked, based on his training and experience investigating gang related activities, what in his opinion a drug organization like the Ghetto Boys would do if someone robbed one of its dealers of money or drugs. He responded, over objection, that they would "kill 'em." Similarly, Indianapolis police detective Phillip Smiley was asked what he thought the Ghetto Boys gang would do if one of their commandments, those introduced into evidence, was violated. Smiley answered, over objection, that he believed the Ghetto Boys would join together and retaliate. The objections at trial were made on two grounds: an inadequate foundation for expert testimo-

---

**19.** Indiana Evidence Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

**20.** The State provided notice of its intent to introduce the prior conviction into evidence in response to defendant's request pursuant to 404(b). At some point, the court made a ruling on the admissibility of this evidence which does not appear to be in the record. This Court's conclusion that admission of the conviction was error under 404(b) is made without the benefit of the trial court's ruling on this issue.

ny under Rule 702(a), and an improper opinion as to an ultimate issue concerning intent or guilt under Rule 704(b). On appeal, Williams contends that these opinions were speculative and that neither Fabian nor Smiley was qualified as an expert to offer such an opinion. Williams does not cite any Rule or other authority. Rather, the discussion of these claims occurs within a general discussion of 404(b).

▮ Assuming it was error to admit this admittedly speculative testimony, the error is harmless. The State offered the testimony as additional evidence of motive, the theory being that because the defendants were Ghetto Boys they would plan, retaliate, and even kill if someone stole drugs or otherwise inflicted harm upon the group. This theory did not depend upon the testimony by the two officers. Rather, their opinion testimony simply was cumulative of the conclusion the direct evidence supported. The jury heard testimony that within twenty-four hours of learning about Reed's theft, the gang members met, and announced their intention to kill him. The jury learned that the group amassed an arsenal of weapons and drove to the apartment complex specifically in search of Reed. This evidence, combined with testimony of Ghetto Boy members that their group was organized to sell crack cocaine, was enough to establish that they planned to kill Reed as a result of his threatening conduct. That the two officers stated their agreement with the theory supporting these events was of marginal significance when compared to the sizeable body of direct evidence of the events themselves. Any error in admitting their testimony was harmless.

## V. Change of Venue

Williams contends that extensive media attention, sensationalizing the "Ghetto Boys" and referring to their prior convictions in federal court, made it impossible for him to receive a fair trial by an impartial jury in Marion County. Accordingly, he contends that the trial court erred in denying his motion—joined by all co-defendants—for a change of venue. The change of venue motion, the evidence supporting the motion, and transcripts of the voir dire and the test jury

were omitted from the record. Williams relies in part on this missing information in support of his claim. It is the defendant's duty to provide a record which reflects the error alleged. *Stallings v. State*, 508 N.E.2d 550, 552 (Ind.1987). To the extent the record is inadequate, it results in waiver of the issue. *Id.* However, the record does reflect two hearings on the motion and includes three newspaper articles submitted as additional evidence to the original motion.

▮ In denying the renewed motion for change of venue, made after the jury had been selected, the court summarized the voir dire proceedings. The court noted that two panels of thirty-five and twenty-five potential jurors were called. Four of these jurors were not even questioned because twelve, plus four alternates, had already been selected. The court described those selected as people who either had no specific recollection of the crime or the "Ghetto Boys," or who said under oath that they would consider only evidence that was admitted at the trial. We review a trial court's decision on a motion for a change of venue only for an abuse of discretion. *Bradley v. State*, 649 N.E.2d 100, 108 (Ind.1995); *Davidson v. State*, 580 N.E.2d 238, 244 (Ind.1991). It is the defendant's burden to demonstrate jurors' inability to disregard preconceived notions of guilt and render a verdict based on the evidence. A showing of the possibility of prejudice is not enough. *Id.* A motion for change of venue need not be granted where voir dire reveals that potential jurors are able to set aside preconceived notions of guilt and render a verdict based solely on the evidence. *Bradley*, 649 N.E.2d at 108 (citing *Lindsey v. State*, 485 N.E.2d 102, 106 (Ind.1985)). The court concluded that the jury selected was fair and impartial and denied the renewed motion. This record does not show an abuse of discretion and the trial court is affirmed.

## Conclusion

▮ We affirm the convictions for conspiracy to commit murder and for murder. Because Williams was sentenced for both a conspiracy and an attempt for the same underlying crime, in direct conflict with Indiana Code § 35–41–5–3(a), we reverse the convic-

tion for attempted murder. In addition, for reasons stated in *Ridley v. State,* 690 N.E.2d 177, 182 (Ind.1997), also decided today, on remand the trial court must include language in the sentencing order indicating that Williams shall not be imprisoned for failure to pay any fines or costs assessed by the court.[21]

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.

---

21. As explained *supra,* Ridley was a co-defendant in this case. Williams, like Ridley, was fined $40,000 as part of his sentence and pauper appellate counsel was appointed for his appeal. Under *Whitehead v. State,* 511 N.E.2d 284, 296 (Ind.1987) fines may not be imposed on an indigent unless the sentencing order expressly states that the defendant shall not be imprisoned for failing to pay. The sentencing order omitted this statement. Although this is not an issue we ordinarily would raise sua sponte, because the issue was raised by a co-defendant from the same trial and this case must be remanded to vacate part of the conviction, we note that the new sentencing order should contain the appropriate language with regard to any assessment of fines or costs.