## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 29 2017, 8:50 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael G. Moore
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Antwane Washington,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 29, 2017

Court of Appeals Case No.
49A04-1606-CR-1432

Appeal from the Marion Superior Court

The Honorable Marc T. Rothenberg, Judge

Trial Court Cause No.
49G02-1512-MR-45400

**Pyle, Judge.**

# Statement of the Case

Antwane Washington ("Washington") appeals his conviction, following a jury trial, of two counts of felony murder.[1][2] He argues that the trial court abused its discretion when it closed the proceedings to spectators during the third day of trial. Finding no abuse of the trial court's discretion in closing the proceedings to spectators, we affirm in part. However, we also reverse and remand with instructions for the trial court to vacate Washington's convictions for Level 2 robbery resulting in serious bodily injury and Level 2 attempted robbery resulting in serious bodily injury.

We affirm in part, reverse in part, and remand with instructions.

---

[1] IND. CODE § 35-42-1-1(2).

[2] Washington was also convicted of Level 2 felony robbery resulting in serious bodily injury and Level 2 felony attempted robbery resulting in serious bodily injury. However, he correctly argues, and the State concedes, that where, as here, a felony murder results from a killing in the commission of a robbery or attempted robbery, the underlying robbery or attempted robbery is a lesser included offense of the felony murder. *See Collier v. State*, 470 N.E.2d 1340, 1341 (Ind. 1984). In such cases, it is a violation of both the federal and state double jeopardy clauses to convict the defendant of both felony murder and robbery or attempted robbery. *Jenkins v. State*, 726 N.E.2d 268, 271 (Ind. 2000) (citing *Richardson v. State*, 717 N.E.2d 32, 50-52 (Ind. 1999)). We therefore remand this case to the trial court with instructions to vacate Washington's convictions for Level 2 robbery resulting in serious bodily injury and Level 2 felony attempted robbery resulting in serious bodily injury. Further, because we have ordered the vacation of Washington's Level 2 felony attempted robbery conviction, we need not address his argument that there is insufficient evidence to support this conviction.

## Issue

The sole issue for our review is whether the trial court abused its discretion when it closed the proceedings to spectators during the third day of trial.

## Facts

[3] In the early morning hours of November 9, 2015, Washington, David Sanders ("Sanders"), and others went to Jonte Johnson's ("Johnson") house to play dice with Johnson, Da'Von Cummings ("Cummings"), Nathan Greer ("Greer"), and Thomas Stewart ("Stewart"). It was the first time that Johnson, Cummings, Greer, and Stewart had met Washington and Sanders. At some point, Sanders became angry, and he and Washington robbed and shot Johnson, Cummings, Greer, and Stewart. Johnson, who was sitting on the couch with his hands up, and Stewart were both killed. Cummings, who was shot five times in the face, and Greer, who attempted to run and was twice shot in the back, survived.

[4] The State charged both Washington and Sanders with two counts of felony murder, one count of Level 2 felony robbery resulting in serious bodily injury, and one count of Level 2 felony attempted robbery resulting in serious bodily injury. The two men were tried together with two additional defendants who were charged with the same offenses.[3]

---

[3] The two additional defendants were acquitted following a jury trial.

[5] On the first day of trial before jury selection, the trial court ordered the spectators not to use their cell phones in the courtroom and warned them that any disruptive behavior would be dealt with quickly and harshly. Following jury selection, the trial court was apprised of several instances of disruptive conduct involving individuals associated with the case. Based on these reports, the trial court explained that it was "seriously thinking about making this a closed jury trial for the purposes of safety." (Tr. 35).

[6] Following a lunch break, the trial court held a hearing on the reports of disruptive conduct. Marion County Sheriff's Deputy Kishu Vaswani ("Deputy Vaswani") testified that five recent arrests had been connected to the case before the trial had even started. Specifically, Deputy Vaswani explained that earlier that day, one man, who reported that his life had been threatened, had started a fight with another man. There had also been an altercation involving families associated with the case on Washington Street outside the City County Building. In addition, two women had been arrested for disorderly conduct the previous week after attending a hearing concerning the case. Further, a woman associated with the case had been arrested that morning while attempting to enter the City County Building.

[7] Dawn Rogers ("Rogers") testified that while attending a pretrial conference the previous week, she had heard one of the defendant's family members threatening that someone was "gonna get it." (Tr. 53). That morning, Rogers had also heard someone calling Cummings' mother and Greer's friend "rats." (Tr. 54). Following this testimony, the trial court asked the attorneys for their

respective positions on closing the courtroom to spectators. Washington's counsel and Sanders' counsel both objected to closing the courtroom. Following argument, the trial court determined that the proceedings would remain open. However, the trial court again warned that it would close the courtroom if there was "any disruption whatsoever." (Tr. 61). The trial court also added an extra police presence in the courtroom and in the building and determined that the spectators would be "wand[ed]" for safety as they entered the courtroom. (Tr. 65).

[8] Despite the trial court's warnings, during Cummings' testimony on the first day of trial, the trial court had to admonish spectators to be quiet and request a deputy to escort one of the spectators out of the courtroom. Also on the first day of trial, Greer, who identified Washington as the defendant who had shot him, became agitated while testifying. Specifically, he engaged in a "stare-down" with Washington and called him a "nigga" several times. (Tr. 183, 187, 193, 202). While being cross-examined by Washington's counsel, Greer continued to stare-down Washington while rubbing his hands together. Greer also became belligerent with Washington's counsel and asked him if he was a lawyer and stated, "you in the way. I don't know how you get a job." (Tr. 209).

[9] On the second day of trial, the trial court noted that there had been "some problems with people in the gallery" and explained that it was:

> very, very close for the purposes of the adjudication of justice and public safety to closing this hearing so no one will be able to

come in.  So it is important for your own safety, for other's safety, that you remain quiet and simply observe.  No communicating with the defendants, none of that.  That is not going to be tolerated.

(Tr. 230).  Following the lunch break that day, the trial court further stated as follows:

> I've been made aware that there were some interactions between the gallery and my court staff.  And, again, it's not going to be tolerated.  This is it, last chance.  I'll simply remove.  And  - - the people who are causing the problems - - I'll simply remove you and you won't be coming back.  I don't care who you're here for. All right?  And, ma'am, I'm looking at you with the (indiscernible) coat on.  Got it?

(Tr. 332).

[10]     The following day after a morning recess, the trial court told the defendants' counsels that a juror had been approached the previous day.  In a hearing outside the presence of other jurors, one juror testified that she and a group of four jurors had been sitting just outside City Market at lunch time when they had been approached by a man who had asked her if she was on jury duty. When the juror failed to respond, the man apologized for asking the question and asked if there were any odd jobs that he could perform at her house.  At the end of the day, that same juror was waiting for her ride at the revolving doors when she saw a group of women who had been spectators at trial.  One of the women approached the juror and asked to borrow her cell phone.  The juror refused the woman's request.

[11] After hearing about these incidents, the trial court advised the attorneys that there would be another hearing regarding closing the trial to spectators. Both Sanders' and Washington's counsels objected to closing the trial. Following the hearing, the trial court issued an order that provides in relevant part as follows:

> 2. In this matter, during every pretrial prior to trial the Court has been disrupted by numerous spectators in the gallery, by the use of phones and talking.
>
> 3. On April 11, the Court has noted no less than 3 arrests involving numerous spectators for this matter in and around the courthouse, all causing disruption in the courthouse by arguing, fighting, and tumultuous conduct.
>
> 4. On April 11, 201[6,] the numerous spectators argued and communicated the nature of the case outside of the jury pool waiting area, essentially poisoning any future prospective jurors.
>
> 5. Throughout this trial, approximately 30 people have been trespassed from the courthouse due to safety and decorum reasons.
>
> 6. On April 12 201[6,] the Court received notice from law enforcement that two witnesses who had testified in this matter had reported that they were threatened and shot at.
>
> 7. On April 12, the Court held a hearing where it considered closing the proceedings due to its concerns for safety, decorum, and administration of justice. During the hearing, Court heard testimony from sheriff's deputies as to disruptions throughout the courthouse and the surrounding area. At that hearing the Court balanced the Defendants' rights to a public trial and the Court's concerns of safety, decorum, and administration of justice. The Court determined that there were less stringent procedures that could be implemented instead of closure of the proceedings to strive to relieve those concerns. The following lesser procedures were put in place:
>
>> a. Extra deputies were assigned to the court proceedings, inside and outside of the courtroom.

b.     Metal detectors were placed outside of the entrance to the courtroom, and all spectators were screened prior to entrance to the courtroom.

c.     The gallery was advised, outside of the [presence] of the jury, that misbehavior would not be tolerated.

d.     As unacceptable behavior was observed by the Court, those spectators were removed.

e.     As many spectators would leave the courtroom and return multiple times, the Court restricted entrance to the court only during breaks from testimony.

f.     The Court made alternate parking arrangements for jurors.

g.     The Court informed the spectators that closure to the public could occur if more incidents were to happen.

8.     Even with these procedures in place, incidents continued to occur; including jurors being approached by spectators in public after the proceeding the evening of April 12, 2016, acknowledging that those spectators knew they were jurors.

9.     On April 13, 2016, the Court Voir Dire'd the entire jury panel, and it was concluded that they could remain fair and impartial.

10.     The Court concludes that these acts of contact could be viewed as attempted intimidation to all those who do business with/in the Court, including jurors, attorneys, witnesses, defendants, judges, law enforcement officers, and other civilians.

11.     Also, such conduct is a danger to both the State and Defendants receiving a fair trial.

12.     On April 13, 2016, outside the presence of the public, the jurors, and defendants, the Court conducted a second hearing on the issue of closing the proceeding to the public. During the hearing, the Court voiced its concerns again, as well as the new incidents of the spectators approaching the jurors. All attorneys,

but for [one], object to the closure to the public. The State [did] not object.

13. In examining further less stringent means to address the Court's concern for safety, decorum, and administration of justice in this case, the Court feels simply limiting one or two specific spectators from the galley will not be an adequate remedy for this situation.

14. The Court also feels that there are no further less stringent procedures, but for closure of the proceedings, that could be implemented that would satisfy the Court's purpose of assuring the integrity of the judicial process, courtroom decorum, public safety, and administration of justice.

15. Based on the continued conduct of the spectators from the gallery, and weighing the Defendants' constitutional right to a public trial, the Court now finds that there is sufficient and legitimate reason to close the above captioned proceeding to the public for the purpose of preserving the integrity of the judicial process, the safety of the defendants, jurors, and all of those in the Courtroom.

16. However, recognizing that the public has a vested interest in the proceedings, the Court will remain open to members of the media to report on the proceedings.

17. Also, the Court will remain open to officers of the court.

18. The Court feels that these measures are necessary to assure the safety of the public, the security of the proceedings, the preservation of courtroom decorum, and the administration of justice, and operation of the Court, while balancing the public interest and Defendants' right in these matters.

(App. 176-78).

[12] The jury subsequently convicted Washington as charged. He now appeals.

# Decision

[13] Washington's sole argument is that the trial court abused its discretion when it closed the proceedings to spectators during the third day of trial. Washington is correct that both the United States and Indiana Constitutions provide him with the right to a public trial. Specifically, the Sixth Amendment to the United State Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . ." The public trial right of the Sixth Amendment applies to the states via the Fourteenth Amendment. *Williams v. State*, 690 N.E.2d 162, 166-67 (Ind. 1997) (citing *Waller v. Georgia,* 467 U.S. 39, 39 (1984)). Likewise, Section 13 of the Indiana Constitution provides that "[i]n all criminal prosecutions, the accused shall have a right to a public trial. . . ."

[14] The right to a public trial has long been recognized as a fundamental right of the accused. *Williams*, 690 N.E.2d at 167 (citing *In re Oliver*, 333 U.S. 257, 266–67 (1948)); *Hackett v. State*, 266 Ind. 103, 109, 360 N.E.2d 1000, 1004 (1977). It helps ensure a fair trial because "the presence of interested spectators may keep [the accused's] triers keenly alive to a sense of their responsibility and to the importance of their functions. . . ." *Waller*, 467 467 U.S. at 47. It protects the accused by allowing the public to assess the fairness of the proceedings. *Williams*, 690 N.E.2d at 167. In addition, it encourages witnesses to come forward and discourages perjury. *Id.*

[15]    However, the right to a public trial is not unlimited. *Hackett*, 360 N.E.2d at 1004. Other interests in the administration of justice may prevail over a defendant's right to a public trial. *Id.* Accordingly, a trial court has the "inherent power to limit spectators in order to relieve overcrowding, to protect the order and decorum of the courtroom and to protect the rights of parties and witnesses, including the prosecuting witness." *Id.* Limited restrictions on the right to a public trial are within the trial court's discretion where they are related to a legitimate purpose furthering the integrity of the judicial process, so long as there is a sufficient record supporting the judge's exercise of that discretion. *Id.* We therefore review the trial court's decision to impose limited restrictions on the defendant's right to a public trial for an abuse of discretion. *See id.* An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts and circumstances before the court. *Hutchison v. State*, 82 N.E.3d 305, 310 (Ind. Ct. App. 2017).

[16]    In determining whether the trial court has abused its discretion in imposing limited restrictions on the defendant's right to a public trial, we use the following four-part analysis set forth by the United States Supreme Court:

> (1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; (2) the closure must be no broader than necessary to protect that interest; (3) the trial court must consider reasonable alternatives to closing the proceedings; and (4) it must make findings adequate to support the closure.

*Kendrick v. State*, 661 N.E.2d 1242, 1244 (Ind. Ct. App. 1996) (citing in *Waller*, 467 U.S. at 48). The defendant does not need to show specific prejudice in order to obtain a reversal for a violation of his right to a public trial. *Id.* Rather, because the loss to both the defendant and society from improperly closing courtrooms is intangible, the prejudice of the non-public proceedings is implied. *Id.*

[17] Here, our review of the evidence and the trial court's findings in support of its decision to close Washington's trial to spectators during the third day of trial reveals that the trial court's overriding interest was its "concern for safety, decorum and administration of justice" that the trial court determined had already been prejudiced by disruptive behavior both inside and outside the courtroom. (App. 177). This disruptive behavior included five arrests connected to the case before the trial had even started. In addition, spectators had to be admonished and even removed from the courtroom because of their disruptive behavior. The trial court's closure was no broader than necessary to protect that interest where the trial court remained open to members of the media to report on the proceedings and to officers of the court. In addition, the trial court held two hearings on closing the courtroom and implemented less stringent procedures before closing the trial to spectators. Specifically, the trial court assigned extra deputies both inside and outside the courtroom. All spectators were screened with metal detectors before they entered the courtroom and were warned that their disruptive behavior could lead to the court's closure to the public. However, even with these measures in place, the

spectators continued to be disruptive, even approaching one of the jurors outside the courtroom. Further, the trial court's findings are adequate to support the closure. Specifically, the trial court (1) documented the disruptive behavior both inside and outside the courtroom that had led to its concern for safety, decorum and the administration of justice; (2) explained how its closure was no broader than necessary to protect that interest; and (3) identified the unsuccessful less stringent measures that it had implemented as reasonable alternatives to closing the proceedings to spectators. Based on this evidence, the trial court did not abuse its discretion when it closed the proceedings to spectators during the third day of trial.[4]

[18] Affirmed in part, reversed in part, and remanded with instructions.

[19] Baker, J., and Mathias, J., concur.

---

[4] We further note that Washington argues that the trial court also violated INDIANA CODE § 5-14-2-3 when it excluded the public from the trial without first conducting a hearing for the public. INDIANA CODE § 5-14-2-3 provides that "[n]o court may order the exclusion of the general public from any criminal proceeding, or part of a criminal proceeding, unless it first affords the parties and the general public a meaningful opportunity to be heard on the issue of any proposed exclusion." However, INDIANA CODE § 5-14-2-7 further provides that "[t]his chapter does not affect the inherent power of a court to make limited exclusions of witnesses, to relieve overcrowding, to protect the order and decorum of the courtroom, or to exclude those individuals whose presence constitutes a direct threat to the safety of the spectators, parties, or witnesses." Here, where the trial court used its inherent power to protect the order and decorum of the courtroom and to exclude spectators who constituted a direct threat to the safety of those associated with the case, the trial court was not required to comply with section 7 and hold a hearing. We find no error.