## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 28 2020, 5:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle Sheff
Sheff Law Office
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of J.C. and J.M. (Children Alleged to be in Need of Services) and M.M. (Mother);

M.M. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

January 28, 2020

Court of Appeals Case No. 19A-JC-1243

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Gael Deppart, Magistrate

Trial Court Cause No. 49D09-1811-JC-2881 49D09-1811-JC-2883

**May, Judge.**

[1] M.M. ("Mother") appeals an order that adjudicated J.C. and J.M. as Children in Need of Services ("CHINS") and that denied the CHINS petition as to N.H. because custody of N.H. had been transferred to N.H.'s father, M.H. Mother presents multiple issues for our consideration which we restate as:

> 1. Whether the trial court violated Mother's right to due process when:
>
>> A. the court consolidated the CHINS proceedings and the custody proceedings regarding N.H., because that consolidation prohibited Mother from being able to timely appeal the trial court's decision regarding N.H.'s custody, and
>>
>> B. the court did not allow the attorney appointed to represent Mother in the CHINS proceedings to also represent Mother in the contested custody proceedings involving N.H.;
>
> 2. Whether the trial court abused its discretion when it allowed a witness to testify in violation of a witness-separation order; and
>
> 3. Whether the trial court's findings support its conclusion that J.C. and J.M. are CHINS.

We affirm.

# Facts and Procedural History

[2] Mother is the biological mother of J.C., born April 15, 2005;[1] N.H., born August 12, 2009;[2] and J.M., born February 25, 2014[3] (collectively, "Children"). On November 27, 2018, Mother drove with Children for twenty-four hours from Florida to Indiana to seek medical attention for J.M. When she arrived at St. Francis Hospital with N.H. and J.M.,[4] Mother asked emergency personnel to examine J.M. because J.M. had allegedly sustained a skull fracture in a recent car accident and, as Mother explained at the hearing, she was "trying to explain that the veins popping out of her head, like she had more veins, visible veins. And I was actually scared because of the high altitudes in the mountains[.]" (Tr. Vol. II at 57-8.) Hospital personnel reported Mother told them she thought that her "children's brains had been hacked." (*Id.* at 78.) Hospital personnel placed Mother is a secured room in the hospital's mental health ward, would not allow her to leave, and called the Department of Child Services ("DCS") because J.M. and N.H. did not have care.

[3] Family Case Manager Chantel White ("FCM White") attempted to speak with Mother, who stated FCM White would "need to bring the President or talk to the FBI." (*Id.* at 113.) Mother asked FCM White if she "saw [C]hildren's brains coming out of their heads." (*Id.*) FCM White reported, "[Mother]

[1] J.C.'s father is deceased.

[2] N.H.'s father, M.H., does not participate in this appeal.

[3] J.M.'s father is incarcerated and does not participate in this appeal.

[4] Mother reported she left J.C. with his paternal aunt in Indianapolis, at J.C.'s request, before going to the hospital.

appeared to be speaking very fast, there . . . she seemed to be crying, she seemed very disheveled." (*Id.* at 114.) Mother was detained on an involuntary psychiatric hold for ten days at St. Francis, and then she was transferred to Valle Vista, a psychiatric facility, for further treatment. DCS filed its petitions to adjudicate Children as CHINS on November 29, 2018. Children did not have care, so DCS placed them with relatives – J.C. went to live with his paternal aunt, J.G.; N.H. went to live with her father, M.H.; and J.M. went to live with her maternal uncle.

[4] On December 18, 2018, the trial court held an initial hearing at which Mother and M.H. appeared. M.H. had indicated prior to the initial hearing that he intended to seek a custody modification, so that he would have physical custody of N.H. The trial court told the parties that the "Family Court Project has approved or bundled, consolidated the JC [CHINS] cause along with the JP [custody of N.H.] case." (Tr. Vol. II at 4.) M.H.'s counsel informed the court, "DCS is otherwise willing to dismiss [the CHINS petition] as to [N.H.] if placement and custody were to be with [M.H.]." (*Id.* at 7.)

[5] Mother did not want M.H. to have physical custody of N.H. Regarding her representation in the custody matter, the trial court and Mother discussed the matter on the same day:

> [Mother]:     I have a question. So this is . . . this is going to be for a separate case in the Marion County Courts as far as custody, is that what we're saying, is that what that's going to be, because for something like that I would definitely need to hire my own attorney, I would assume.

[Court]:     That's up . . . that's up to you whether you hire an attorney for it or not.  I know Ms. Benson [Mother's appointed counsel] or any attorney from [the] public defender agency is unable to represent a parent in a custody matter that's here in this Court or even downtown, as far as I know.  But, all that to say, Mr. Olson [M.H.'s private counsel] has been requested . . . has requested that we set this petition for modification of custody for a parties [sic] pre-trial in about 30-days.  That would give you enough time in terms of contacting an attorney and also if you do not hire an attorney, to talk to Mr. Olson in terms of what you and he may be thinking about. . . .

(*Id.* at 9.)  The trial court then set a mediation for the parties regarding the custody for February 3, 2019, and a bifurcated hearing on February 26, 2019, to address the CHINS petitions and N.H.'s custody.

[6]     On February 26, 2019, Mother requested a continuance of the custody matter because she had traveled to Florida for work, had returned to Indiana on the Friday before the hearing, and had been unable to hire private counsel because of a lack of funds.  The trial court denied the continuance and accepted evidence regarding the CHINS petitions.  At the end of the CHINS hearing, the trial court indicated it would hold the change of custody hearing, during which Mother would proceed *pro se.*

[7]     On April 2, 2019, the trial court adjudicated J.C. and J.M. as CHINS.  In the same order, the court indicated N.H. was not adjudicated a CHINS because "[M.H.] is a fit and willing parent in whose care [N.H.] has been placed, by DCS and subsequently by court order, since on or about 11/28/18, and in whose care [N.H.] is thriving."  (App. Vol. II at 146.)  On April 30, 2019, the

trial court entered its dispositional orders as to Mother and ordered her to participate in services in the CHINS cases for J.C. and J.M.

# Discussion and Decision

## 1. Due Process

[8] Due process is essentially "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). A due process analysis in a CHINS adjudication turns on the balancing of three factors: "(1) the private interests affected by the proceeding; (2) the risk of error created by the States chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012). Mother argues the trial court denied her due process when it did not permit the attorney court-appointed for the CHINS proceedings to also represent Mother in the custody proceedings regarding N.H. Mother also argues her due process rights were violated when she allegedly was unable to appeal the modification of N.H.'s custody to her father, M.H.

### A. Appeal of Custody Modification Decision

[9] Mother argues her due process rights were violated because the consolidation of the proceedings "forclos[ed] appellate review of the decision to modify custody by finding that NH was not a CHINS and proceeding to the Dispositional Hearing and Decree only as to JC and JM." (Br. of Appellant at 44) (errors in

original).  Mother has not indicated that she attempted to file an appeal of the custody modification decision, nor has she argued on appeal that legal precedent prevented her from doing so.  As she has not made a cogent argument on this issue, it is waived.  *See Martin v. Hunt*, 130 N.E.3d 135, 137 (Ind. Ct. App. 2019) (failure to make a cogent argument, without citation to legal precedent, results in waiver of the issue for appellate review).

## B.  *Appointed Attorney for Custody Modification*

[10]    Mother also argues

> MH hired private counsel who filed for Modification of Custody in the paternity action requiring that the paternity-custody matter be joined in the CHINS court which was vested with exclusive jurisdiction of the custody issues.  Instead of allowing appointed counsel in the CHINS matter to represent MM on [sic] the custody matter as to NH, the Juvenile Court misconstrued the core nature of the intertwined CHINS and custody proceedings to bifurcate the proceedings, require MM to hire private counsel, and then hold a hearing where appointed counsel was barred while MM attempted to represent herself at a hearing whereat MH was represented by private counsel with regard to NH's custody.

(Br. of Appellant at 42.)  Mother has not cited any precedent to support her argument that the trial court should have appointed counsel to represent her during the custody modification hearing regarding N.H., and thus the issue is waived.  *See Martin*, 130 N.E.3d at 137 (failure to make a cogent argument results in waiver of the issue for appellate review).

[11] Additionally, even had Mother cited precedent to support her argument, she failed to provide a transcript of the hearing for which she claims the court should have given her counsel. This failure to provide the record renders us incapable of reviewing this issue. *See Williams v. State*, 690 N.E.2d 162, 176 (Ind. 1997) (it is the appellant's responsibility to "provide a record which reflects the error alleged").

[12] Finally, even if the trial court erred when it did not appoint counsel to represent Mother during the proceedings to modify N.H.'s custody to M.H., it is unlikely the presence of counsel could have changed the trial court's ruling in the custody proceedings. The record indicates N.H. had been living with her biological father for at least four months and she was thriving in his care. Furthermore, if custody of N.H. were not modified to her father, then she would remain in Mother's custody, from which she would immediately be removed and placed in foster care pursuant to the CHINS proceedings. Given these facts and our "strong presumption that the child's best interests are ordinarily served by placement in the custody of a natural parent[,]" *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002), it is unlikely Mother could demonstrate more than harmless error. *See* Indiana Appellate Rule 66(A) (Explaining no trial court error "is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.").

## 2. Separation of Witnesses

[13] "The purpose of a separation of witnesses order is to prevent witnesses from gaining knowledge from testimony of other witnesses and adjusting their testimony accordingly." *Childs v. State*, 761 N.E.2d 892, 895 (Ind. Ct. App. 2002). Once the trial court grants a party's request for separation of witnesses, any violation of that order is left to the sound discretion of the trial court, and we will not disturb the trial court's decision unless there exists an abuse of that discretion. *Id*. at 894. An abuse of discretion occurs when "the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or where the trial court has misinterpreted the law." *Id*.

[14] During the CHINS fact-finding hearing, Mother asked the trial court to order a separation of witnesses. Mother noted that N.H.'s paternal grandmother and J.C.'s paternal aunt, J.G., were in the courtroom and would be testifying at some point. The trial court then stated, "[N.H.'s paternal grandmother], you'll need to step outside, please." (Tr. Vol. II at 26.) It is unclear from the record whether paternal aunt also left the courtroom, but later in the proceedings, during M.H.'s testimony, Mother notified the court about J.G.'s presence:

> [Mother]: And Judge, I'm . . . I'm sorry to interrupt but I just realized that there's a proposed DCS witness sitting in here and I had asked for a separation of witnesses. So I move to . . . I . . . I don't want her to be able to testify given the fact that she's been able to observe. And I apologize for not noticing, it's just when I walked in . . . it's my fault for not looking but I just happened to look over my shoulder and saw someone there.

(*Id*. at 49.) DCS replied that J.G.'s testimony would not "at all be tainted by what's [sic] she's hearing thus far and I think that it . . . it would just prejudice the case to not allow her to testify." (*Id*.) Based thereon, the trial court asked J.G. to leave the courtroom.

[15] Mother also objected when DCS called J.G. as a witness, arguing that she violated the separation of witnesses order when she "came back knowing that the Court had ordered her not to be here[.]" (*Id*. at 97.) DCS replied that all the testimony prior to J.G. had "primarily been [in] regards to [N.H.] and [M.H.]" and thus J.G. would not be biased by the earlier testimony. (*Id*.) The trial court overruled Mother's objection and allowed J.G. to testify.

[16] On appeal, Mother does not indicate how the trial court's decision to allow J.G. to testify after J.G. was in the courtroom in violation of the separation of witnesses order was an abuse of the trial court's discretion. We conclude the trial court did not abuse its discretion when it allowed J.G. to testify because J.G.'s testimony primarily involved J.C., not N.H., who was the subject of the testimony prior to J.G.'s testimony, and thus J.G.'s presence in the courtroom during the testimony regarding N.H. was unlikely to have prejudiced J.G.'s testimony regarding J.C. *See Roser v. Silvers*, 698 N.E.2d 860, 865 (Ind. Ct. App. 1998) ("In the absence of connivance or collusion by the party calling the witness, the trial court may permit the testimony of a witness in violation of a separation order.").

[17] After J.G.'s testimony, DCS called FCM White as a witness. Mother objected because FCM White was present for earlier testimony of Mother, M.H., and J.G. DCS argued FCM White was an "[a]gent representative" and thus not subject to the separation of witnesses order. (Tr. Vol. II at 111.) The trial court overruled Mother's objection. Mother argues the trial court abused its discretion when it allowed FCM White to testify.

[18] Indiana Evidence Rule 615, which governs the separation of witnesses during a hearing, does not allow the exclusion of "an officer or employee of a party . . . after being designated as the party's representative by its attorney." Ind. Evid. R. 615(b). During the hearing, Mother acknowledged that FCM White was DCS's agent representative. Therefore, the trial court did not abuse its discretion when it allowed FCM White to testify because FCM White could not be excluded by the separation of witnesses order. *See Fourthman v. State*, 658 N.E.2d 88, 91 (Ind. Ct. App. 1995) (investigating officer was permitted to remain in the courtroom under the exception set forth in Indiana Evidence Rule 615(b)), *trans. denied*.

### 3. CHINS Adjudication of J.C. and J.M.

[19] A CHINS proceeding is civil in nature, so DCS must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). Indiana Code section 31-34-1-1 states:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

A CHINS adjudication "focuses on the condition of the child," and not the culpability of the parent. *In re N.E.*, 919 N.E.2d at 105. The purpose of finding a child to be a CHINS is to provide proper services for the benefit of the child, not to punish the parent. *Id.* at 106.

[20] When a juvenile court enters findings of fact and conclusions thereon in a CHINS decision, we apply a two-tiered review. *Parmeter v. Cass Cty. DCS*, 878 N.E.2d 444, 450 (Ind. Ct. App. 2007), *reh'g denied*. We first consider whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We may not set aside the findings or judgment unless they are clearly erroneous. *Id.* Findings are clearly erroneous when the record contains no facts to support them either directly or by inference, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* We give due regard to the juvenile court's ability to assess witness credibility and we do not

reweigh the evidence; we instead consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.* We defer substantially to findings of fact, but not to conclusions thereon. *Id.* Mother does not challenge the trial court's findings of fact, and thus they stand as proven. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct.").

[21] Mother argues the trial court erred when it adjudicated J.C. and J.M. as CHINS because the incident relied upon by the trial court was "outdated" and "acute." (Br. of Appellant at 48-9.) To support its CHINS petition, DCS alleged Mother drove with J.C., J.M., and N.H. for twenty-four hours from Florida to Indiana to seek medical treatment for J.M. Mother "presented at St. Francis Hospital stating 'her children are being brain hacked' and 'her children's brains were coming out of their heads.'" (App. Vol. II at 143.) J.C. reported to DCS that Mother "talked to herself saying things like, 'get out of my head, and quit talking to me' . . . [and] she would also tell [the children] that they had horns coming out of their heads." (*Id.*) Emergency personnel at St. Francis examined the children, placed Mother on a ten-day psychiatric hold, and then transferred Mother to the Valle Vista treatment center, leaving the children without care. Children were placed with various relatives.

[22] In the time between the children's removal and the fact-finding hearing, Mother testified she has started a new medication for her mental illness but had yet to

engage in therapy. Regarding Mother's actions in the intervening time, the trial court found:

> 44. Between 2/4/19 and 2/23/19, [Mother] went to Florida to work for her father. She did not participate in services during this period, but maintained phone contact with her children.

> 45. [Mother] saw the DCS service provider and therapist Jeremy five (5) times prior to her trip to Florida [from] 2/4/10 [sic] [to] 2/23/19, and she states she has no [sic] missed any appointment [sic] with him except during the three (3) weeks between 2/4/19 and 2/23/19.

> 46. [Mother] says her family doctor has complete and utter control and is always looking and evaluating if [Mother] needs a therapist, but currently her doctor is okay with [her] taking the medicine [she's] taking and not working with a therapist except through DCS.

> 47. The only therapist [Mother] has seen in the last year is either because DCS required her to do so, or because she was detained involuntarily for a psychiatric evaluation at St. Francis and transported for [an] involuntary stay at Valle Vista.

> 48. [Mother] does not think it [is] important to see a therapist to address ongoing mental health issues [stating]: ["]Ive [sic] not gone because my doctor said the Zyprexa was working, they watched me there, and I was okay to go with the therapy I had done there, and my doctor cleared me, so I believe no.["]

> 49. Regarding working with the DCS service provider and therapist, [Mother] states[:] ["]I'm not in any type of needs [sic].["]

(*Id*. at 145-6.)

[23]     While the trial court noted the reason for DCS's initial intervention, that is, Mother's drive from Florida to Indiana to have her children treated at St. Francis hospital, it also made findings regarding Mother's behavior at the fact-finding hearing and in the time between the children's removal and the hearing, and regarding Mother's willingness to participate in services. The trial court's findings cited *supra* and others in the order support the trial court's conclusion:

> Court finds that DCS has met its burden by a preponderance of evidence that [J.C.], and [J.M.], are children in need of services on the basis that those childrens [sic] physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with food, clothing, shelter, medical care, education, or supervision; and the child needs care, treatment, or rehabilitation that the child is not receiving; and is unlikely to be provided or accepted without the coercive intervention of the Court. Thirteen year-old [J.C.] has been the subject child of four (4) CHINS cases since he was 8, where [Mother] participated in and/or completed services to address domestic violence, substance usage, and mental health issues. Four year-old [J.M.] has been the subject child of three (3) CHINS cases since she was one year-old, where [Mother] participated in and/or completed services to address domestic violence, substance usage, and mental health issues. This most recent CHINS case begins with the children taken to a hospital by [Mother] upon the basis that [Mother] observed her child's brains coming out of their heads. [Mother] thinks she does not need services to include therapy, notwithstanding this current CHINS is the fourth CHINS involving her and her children in five (5) years, certainly not for herself, and questionably for her children.

> [Mother's] participation in and/or completion of court-ordered services, whether in prior cases or at the time of fact-finding has not resolved the need for these children to receive necessary supervision by a parent who is mentally healthy.

(*Id.* at 146-7.) Based thereon, we conclude the trial court did not err when it adjudicated J.M. and J.C. as CHINS. *Contra Matter of E.K.*, 83 N.E.3d 1256, 1262 (Ind. Ct. App. 2017) (reversing CHINS adjudication because DCS did not prove coercive intervention of the court was necessary when parents had made great strides in addressing the issues that resulted in CHINS investigation, retained custody of their children, and were actively participating in treatment), *trans. denied*.

# Conclusion

Mother has waived her due process arguments regarding her alleged inability to appeal the custody modification and the trial court's denial of appointed counsel for the custody portion of the proceedings. Additionally, we hold the trial court did not abuse its discretion when it allowed J.G. and FCM White to testify; Mother did not indicate how the trial court abused its discretion when it allowed J.G. to testify in violation of the separation of witnesses order, and FCM White was exempt from the separation of witnesses order by virtue of the fact that she was DCS's agent representative. Finally, the trial court did not err when it adjudicated J.C. and J.M. as CHINS. Accordingly, we affirm.

Affirmed.

Najam, J., and Bailey, J., concur.